Filed 2/14/25  R.R. v. Superior Court CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| R.R.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SANTA CLARA COUNTY,<br><br>    Respondent;<br><br>SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>    Real Party in Interest. | H052729<br>(Santa Clara County<br> Super. Ct. No. 23JD027605) |

## I.    INTRODUCTION

R.R., the father of the child at issue in this juvenile dependency matter, has filed a petition for extraordinary writ challenging the juvenile court's order at the six-month review hearing terminating family reunification services and setting the matter for a Welfare and Institutions Code section 366.26[1] permanency planning hearing.  Father, who has been in custody during the entirety of the juvenile dependency proceedings, contends that there is not substantial evidence to support the juvenile court's finding that he was provided reasonable reunification services.

---

[1] All further statutory references are to the Welfare and Institutions Code.

We conclude that the record does not contain substantial evidence that reasonable services were provided or offered to father. We will therefore grant father's petition for extraordinary writ.

Father also seeks an immediate stay of the section 366.26 hearing, which is scheduled for March 19, 2025. (Cal. Rules of Court, rule 8.452(f).) Father's request for a stay of the section 366.26 hearing is mooted by this court's grant of writ relief.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In late August 2023, police responded to a domestic violence call at mother's residence. The child, who was almost nine months old, resided with mother. Father had forced open the front door of mother's residence and hit her with a metal object from the door, resulting in a facial injury to mother. Father fled after the incident. Mother told the police that father had been incarcerated and was released two months prior. She did not want to have a relationship with him anymore because, among other reasons, he was verbally abusive towards her and used methamphetamine. When he was released from jail, he came to her apartment and began to kick the door. Father was arrested on September 2, 2023, and remained in custody throughout the duration of the dependency proceedings.

A referral was made to the Santa Clara County Department of Family and Children's Services (Department), which began an investigation. On September 13, 2023, mother tested positive for methamphetamine and marijuana.

In late September 2023, the police were again called to mother's residence due to fighting or arguing. Mother and other adults at the residence appeared to be under the influence of drugs. The home was dirty with bugs everywhere, there was an odor of a controlled substance, and drug paraphernalia was observed. Mother was arrested for child endangerment and being under the influence of a controlled substance. The maternal grandmother was called to take the child. When mother was released from custody, the maternal grandmother returned the child to mother. When contacted by the

Department, mother denied current drug use and contended that the police had provided false information about her. Mother made excuses for not meeting with the Department, which was attempting to assess the child in her care.

Although the record is not entirely clear, it appears that the child was placed into protective custody on September 23, 2023. On September 25, 2023, mother tested positive for various substances including methamphetamine.

**A.** *Section 300 Petition*

On September 26, 2023, the Department filed a petition under section 300, subdivision (b)(1) [failure to protect] alleging that the child, then nearly 10 months old, came within the jurisdiction of the juvenile court. The petition alleged that the child was at substantial risk based on the parents' abuse of methamphetamine and domestic violence issues.

Following a detention hearing, the juvenile court declared father to be the presumed parent of the child. The court also ordered, as recommended in a report by the Department, that the child continue to be detained, with supervised visitation for mother a minimum of twice per week, and supervised visitation for father a minimum of twice per week "[w]hen released from custody." Father, who was present with counsel at the hearing, did not object to the visitation order.

**B.** *Jurisdiction/Disposition*

**1. Jurisdictional/Dispositional Report (October 2023)**

In an October 2023 jurisdictional/dispositional report, the social worker indicated that father, who was still in custody with no release date, reported that he had been in and out of jail due to petty theft, possession of drugs, and possession of illegal firearms. His most recent arrest was for domestic violence against mother and a probation violation, but he denied engaging in domestic violence. Father indicated that due to the pending criminal charges, he was unable to discuss further the issue of domestic violence.

3

Father stated that, except for a period of time between 2014 and 2016, he had been using methamphetamine almost daily until his incarceration in August 2023. He wanted to enroll in "Dependency Wellness Court," and he wanted to enter a substance treatment program upon his release from custody and have stable housing to reunify with the child. Mother minimized her substance abuse but acknowledged that she needed to enter an inpatient treatment program.

Father indicated that he and mother were a couple, but mother denied being in a relationship with him. Both denied domestic violence between them. In addition to the August 2023 incident, the police had been called to prior incidents involving domestic violence between the parents. In one of the incidents, father was arrested for domestic violence, possession of methamphetamine, and possession of paraphernalia.

The child was in a confidential foster home while the Department explored placements with relatives. Mother had been attending visits with the child two times per week. The social worker reported that "father has been in custody and visits for him and the child have not occurred."

The jurisdictional/dispositional report stated that the social worker "would encourage [father] to engage in any all [sic] programs available to him while he is incarcerated." The social worker was "encouraged by his plan to enter an impatient substance abuse treatment program upon his release." Although father was unable to discuss the issue of domestic violence due to the pending charges, the social worker expressed "hope that he understands the serious nature of such acts and the emotional and physical impact his actions could have on his son." The social worker indicated that it was "important" for father to address substance abuse and domestic violence issues and to start visiting his son upon his release from custody.

The Department recommended that the section 300 petition be sustained, that the child be adjudicated a dependent of the court, and that both parents receive family reunification services. The proposed case plan for both parents included: (1) a parenting

class, (2) a program of counseling or psychotherapy addressing domestic violence and substance abuse and the effect on the child, (3) random alcohol and/or drug testing at least once a week, (4) a 12-step program or other substance abuse self-help program, (5) a substance abuse assessment and treatment programs as recommended in the assessment, and (6) an aftercare drug treatment program. The proposed case plan also required father to participate in a certified 52-week batterer's intervention program. Supervised visitation for the parents was recommended a minimum of twice per week for mother and a minimum of twice per week for father "when he is released from custody."

### 2. First Addendum Report (November 2023)

In an addendum report, the social worker indicated that the child had been placed with the paternal aunt and uncle in October 2023. The social worker met with father at the jail on October 12, 2023. He reported that he was receiving services through "Drug Wellness Court." Father further stated that he would be released on October 31, 2023, and he wanted to enter a treatment program. However, when the social worker checked on an "inmate locator" in mid-November 2023, father was still in custody and there was no release date indicated.

### 3. Second Addendum Report (December 2023)

In a second addendum report, the Department indicated that the child was doing well in his placement with his paternal relatives. On December 11, 2023, the social worker checked the inmate locator for father, who was still in custody, had a criminal court hearing set for December 29, was not allowed bail, and had no release date listed. The addendum report stated that the social worker "would encourage [father] to engage in any and all treatment programs and parenting classes he can while incarcerated. Upon release it will be important for him to contact the Social Worker immediately to set up visitations and to obtain referrals to services."

### 4. Third Addendum Report (February 2024)

In a third addendum report, the social worker indicated that the child continued to do well in the care of his paternal relatives. Mother had missed 17 of 19 drug tests. Father remained in custody with no release date. The social worker reported speaking to father "about taking the opportunity to engage in any and all programs available to him and upon his release and to immediately contact the Social Worker to engage in services and set up visits with the child."

### 5. Jurisdictional/Dispositional Hearing (February 2024)

The combined jurisdictional and dispositional hearing was continued several times between October 2023 and February 2024. At the originally scheduled hearing on October 18, 2023, father indicated that he anticipated being released from custody in his criminal case on October 31, 2023. At the continued jurisdictional/dispositional hearing in November 2023, father was still in custody, but he indicated that a hearing was scheduled for December 19, 2023 in his criminal case, and he was hopeful that the criminal case would be successfully resolved. At the continued jurisdictional/dispositional hearing in mid-December 2023, mother requested a contested hearing.

The jurisdictional/dispositional hearing finally took place on February 28, 2024. The child was almost 15 months old. Mother indicated that she was no longer requesting a contested hearing and that she was submitting the petition based on the social worker's report and other documents.

Father also submitted the petition. Father's counsel stated, "On behalf of father, we were always planning on submitting."

Father's counsel further stated that father "is hoping the Department could arrange just even brief phone calls with [the child]. . . . [Father] understands obviously [the child] won't be able to have much of a conversation back but he just . . . wants his son to be able to hear his father's voice and [counsel was] hoping the Department will work on

6

coordinating that." Counsel indicated that he had discussed with father the possibility of sending notes, cards, and drawings to the child as well. Counsel also stated, "[W]hile my client is in custody, . . . there are some services that are analogous to the case plan he would be doing if he was out of custody. I would just encourage the Department to explore those options with him so that . . . he's able to do as much as he can with the time that he has. Certainly he wishes he could do more just, unfortunately, because of the nature of his charges and . . . being incarcerated, it does place limits." Counsel indicated that father had reported "doing the DV course work" and "NA meetings" while incarcerated and that father was willing to provide certificates confirming his attendance. Counsel expressed hope that the Department and the court are "going to be able to see that despite the many challenges [father] is currently facing . . . he's still doing what he can with what he has."

The juvenile court admitted into evidence the Department's report and addendums. The court found the allegations of the petition true and adjudged the child a dependent of the court. The court ordered the child removed from the physical custody of his parents and ordered that family reunification services be provided as recommended by the Department.

C. *Six-Month Review*

**1. Six-Month Review Report (August 2024)**

A six-month review hearing was initially scheduled for August 16, 2024. In a report filed on August 7, 2024 in anticipation of the hearing, the Department recommended that reunification services be terminated and that a section 366.26 hearing be set to establish a permanent plan for the child. At the time, the child remained with his paternal relatives who were "meeting all of the child's needs and he seem[ed] to be thriving in their care."

The social worker reported that father was initially incarcerated at (1) Elmwood Correctional Facility (Elmwood) until May 2024 (which was about three months after the

7

February 2024 dispositional hearing), then (2) "Kern State Prison" until July 2024, then (3) Folsom State Prison until at least early August 2024, and that father anticipated being transferred to (4) San Quentin or to "New Folsom State Prison."

While father was at Elmwood in April and May 2024, the social worker "maintained regular contact with . . . father by telephone and in-person visits." Father called the social worker weekly, but those calls stopped after his transfer to state prison. When the social worker met with mother in mid-June 2024, mother stated that father had called her from prison and asked her to share his contact information with the social worker. The social worker expressed concern that father violated his restraining order by contacting mother.

The social worker did not have any communication with father between the time he transferred out of Elmwood in May 2024, through July 2024, despite the social worker writing to father and providing his family with the social worker's contact information. The social worker mailed a letter to father while he was in "Kern State Prison," but father indicated that he did not receive it until after he was transferred to Folsom State Prison. Father called the social worker from Folsom State Prison on August 1, 2024, to report that he would be transferred to San Quentin or to "New Folsom State Prison," and he would call the social worker after he was transferred and permitted to use the phone. Father stated that his scheduled release date was September 2025. The social worker provided father with his attorney's telephone number, encouraged father to call his attorney, and informed father of the social worker's recommendation to terminate reunification services and set a section 366.26 hearing to establish a permanent plan. At some point, the social worker also contacted father's counsel "on behalf of the father."

Regarding father's compliance with his case plan, the social worker stated that "[d]ue to . . . father's incarceration, he could not participate in most aspects of his case plan, however, the [social worker had] mailed workbook/pamphlets regarding intimate partner violence as well as child development pamphlets to . . . father" in April 2024

8

while he was still at Elmwood. The social worker also provided father with his court date, attorney information, and case plan by mail.

The social worker indicated that father would "be referred . . . upon his release from prison" to most of the classes and programs in his case plan, including: (1) a parenting class (in addition to the workbook/pamphlet on child development that the social worker mailed to father in April 2024), (2) a program of counseling or psychotherapy addressing domestic violence and substance abuse and the effect on the child, (3) random alcohol and/or drug testing at least once a week, (4) an aftercare drug treatment program, and (5) a certified 52-week batterer's intervention program.

Regarding the requirement in the case plan that father attend a 12-step program or other substance abuse self-help program, the social worker stated, "The [social worker] will continue to encourage . . . father to attend 12-step meetings if/when able to do so, depending on where he is 'housed,' while in prison."

Regarding the case plan requirement that father complete a substance abuse assessment and complete treatment plans as recommended in the assessment, the social worker acknowledged that father had not been able to do an assessment because of his incarceration. The social worker reported, however, that father had attended substance abuse treatment classes while at Elmwood and received a certificate of completion in mid-April 2024.[2] When asked by the social worker about his participation in the program, "father indicated he was proud of himself in trying to learn and obtain as many new skills that he could while in custody."

The social worker also reported that, although the following classes or programs were not part of father's case plan, father had provided documentation to the social

_____

[2] The record reflects that the substance abuse treatment classes were provided by Asian American Recovery Services at the Elmwood. The curriculum was described as "a flexible, evidence-based program that meets DSM-5 classifications. This flexible program draws from cognitive-behavioral, experiential, and Twelve Step approaches to help clients achieve lifelong recovery."

9

worker reflecting his participation in or completion of: (1) a college level communication class entitled in part "Intro to Oral Interpretation" in March 2024, (2) a college class entitled in part "Psychology of Drug Abuse," and (3) a sheriff's program called "Rehabilitation Courses" in February 2024. (Some capitalization omitted.)

The social worker scheduled father to have telephone contact with the child twice a week between 5:00 pm and 7:00 p.m. Father's calls were "sporadic" and the relative caregivers "had to re-direct . . . father, at times, because he would start asking about the mother, instead of focusing on the child." The social worker "had conversations" with father about his telephone calls with the child and made suggestions such as father singing songs and reading a book to the child. The social worker also provided father with "coloring pages so that he could color [them] and mail them to the child." Father did not call the child/relative caregivers during May, June, and July 2024 after he was transferred from Elmwood to state prison.

The social worker found that the parents loved the child but that they had not been able or willing to do what was necessary to ameliorate the issues that brought the child to the attention of the Department. Regarding father, the social worker explained that father's incarceration "has interfered with . . . father being able to fully participate in his court ordered case plan." In addition, father was "inconsistent" with his telephone calls to the child even when father had telephone access, and he had to be "redirected" by the relative caregivers to focus on the child rather than asking about mother during the calls he did make. Moreover, father and mother "continue[d] to have contact, despite there being an active restraining order and multiple reminders from the [social worker] about the need to abide by the court ordered [r]estraining [o]rder." Although the child could not be returned to father's care due to his incarceration, the social worker observed that even if father was released, there was "no way of knowing if he would actively engage and participate in his services and/or remain drug free." The social worker believed that father's actions in contacting mother and violating a court order indicated that father was

10

"not fully ready to comply with the court's orders and recognize the need to change behaviors that don't serve him and/or would not serve his child and keep his child in harm's way." Regarding mother, the social worker found that she had made "minimal progress" in attempting to address the issues that brought the case to the Department's attention. For these reasons, the social worker recommended that reunification services for both parents be terminated and that a section 366.26 hearing be set.

At the scheduled six-month review hearing on August 16, 2024, mother expressed disagreement with the Department's recommendation to terminate services, and she requested an early resolution conference and a contested hearing. Father's counsel explained that father was not present at the hearing because father was in custody and had "been doing a lot of moving around to various facilities recently." Father's counsel stated that he originally intended to request a continuance of the hearing because of the "difficulty" in reaching father while "he's been transported around," but in view of mother's request, father's counsel would be present for both the trial and early resolution conference. Father's counsel requested that an order be made to transport father to the conference. Although this was "not typical," counsel explained that he had not been able to talk with father. The juvenile court scheduled the early resolution conference for September 4, 2024, scheduled the contested review hearing for October 21, 2024, and ordered that father be transported.

**2. Addendum Report and Early Resolution Conference (September 2024)**

In an addendum report filed on September 4, 2024, the social worker reported that father had "engaged in the services available to him while incarcerated and ha[d] maintained communication with" the social worker. The social worker also reported that father "regularly contacts . . . mother despite the restraining order." Further, "[w]hile maintaining communication with . . . mother, . . . father has decreased his communication with the child and no longer has a regular call schedule with him." The social worker

11

believed that, given "father's expected release date of September 2025, it is unlikely that . . . father would reunify with the child if granted additional reunification time."

The matter was not resolved at the September 4, 2024 early resolution conference. At a hearing that same day, mother and father each indicated that they would be contesting the Department's recommendation that services be terminated. Father's counsel further stated, "As the Court is aware from prior reports, [father] has been engaging in a case plan while in custody, which, as the Court is aware, is no easy matter. [¶] . . . [¶] And he is certainly doing what he can. [¶] Additionally, [father] is currently trying to engage in programs . . . while he's in custody that will hopefully shorten his sentence, which actually would lead to a potential release date very close to when the 12 month review date would be statutorily happening, which will be part of my argument . . . at the contested hearing."

### 3. Addendum Reports (October 2024)

In addendum reports filed on October 17 and 18, 2024, the social worker recommended that a permanent plan be implemented for the child with his current relative caregivers. The social worker reported that the child "continue[d] to do well" in the relative caregivers' home. Further, the relative caregivers had "expressed a desire to ensure that the familial ties between the child, his parents and extended family will continue as long as it is safe, appropriate and in the child's best interest to do so."

The social worker reported that father continued to call the child from prison once or twice a week. The social worker recognized that father was attempting to have consistent calls with the child, but the caregiver reported that at times, father did not call, or he found it difficult to engage the child by telephone and on video calls. The caregiver explained that the child often looked away and needed encouragement by the caregivers to talk to father.

12

**4. Contested Six-Month Review Hearing (October and November 2024)**

The contested six-month review hearing took place on multiple days in October and November 2024. The Department's August 2024 report and addendums were admitted into evidence, and the Department rested based on those documents.

Mother proceeded to call the social worker to testify. Relevant to this appeal, the social worker testified that case plans (1) are based on the concerns that have brought the child to the attention of the Department and the court, (2) are tailored to each family's needs, and (3) are not the same in every case.

Father testified that he was incarcerated at Elmwood in Santa Clara County when the dependency case was opened. According to father, the social worker contacted father in person twice. Father indicated that he attempted to contact the social worker "approximately every other day twice, three times a day." Father testified that during his time at Elmwood, the social worker advised father of "services in the jail that could help [father] complete [his] case plan." When asked what he was advised of, father testified, "[T]here [were] parenting classes, domestic violence classes, NA classes. And all those classes I would attend and completed [sic]." However, father also testified that the social worker did not advise him of "any way [he] could complete those courses while incarcerated at Elmwood." Father later clarified that the information provided by the social worker about available programs at Elmwood "were just booklets of . . . proper ways to handle children, their current age, the age limits on what they require, the food, the care, responsibilities, . . . [and] some anger management . . . within the booklet."

Father testified that he was transferred to "Delano State Prison/North Kern," where he stayed approximately two months Before the transfer from Elmwood to this prison, he told the social worker that he would be leaving within a few weeks and that "it would be difficult for [him] to get ahold of [the social worker] due to the [phone] arrangements" at that prison. He further explained to the social worker that "it would be very difficult" for him to get ahold of the social worker until he was transferred again to

"the main prison" where he would be doing "the rest of [his] time." At the time, he did not know where that would be. While he was at "Delano State Prison/North Kern," father was not aware of any attempts by the social worker to reach him. He indicated that during the majority of the time that he was there, he could only make a call on the weekends. Because he was allotted only one phone call, he "was only able to call [his] family" and not his son.

Father was next transferred to Folsom State Prison, or "Old Folsom," where he stayed approximately three weeks to a month. While at this prison, father was "in the hole" for all but the final two days and not allowed any phone calls. He did receive a letter from the social worker indicating that the social worker needed to get ahold of father. Two days before father was transferred out of Folsom State Prison, he was able to contact the social worker. Father told the social worker that he was going to be transferred to San Quentin or "New Folsom."

Father testified that after he was transferred in July 2024 to "New Folsom," he had "multiple" conversations with the social worker. Father's schedule at the prison included working a job from 6:30 a.m. to 2:30 p.m., returning to his pod where "lockdown" is from 3:30 p.m. to 4:30 p.m., and having dinner at 5:00 p.m. Father acknowledged that "due to the hours, we miss each other," in reference to phone calls with the social worker. Father testified that the social worker did not advise him of any case plan courses that would be available to him at "New Folsom," and she did not provide any advice on how he could complete his case plan at "New Folsom." He also testified that he was unaware of any attempt by the social worker to contact the prison to set up case plan courses. Father further testified that he was willing to engage in appropriate case plan services if they were offered at "New Folsom." Father testified that his current release date is September 1, 2025.

Following the close of evidence, the Department argued that family reunification services for both parents should be terminated because there was no possibility that the

child might be returned to the custody of either parent before November 22, 2024, the date that the Department calculated was "the end of 12 months from the date that [the child] entered foster care." The Department contended that father's phone visits with the child were sporadic and often involved father asking about mother rather than engaging the child. The Department also argued that father was "not in a position to participate in a case plan or make substantive progress until his release" in September 2025, and that the services that had been available to him did not result in the substantial progress required for reunification.

Father's counsel contended that the Department failed to meet its burden of showing that reasonable services were offered or provided. Counsel argued that a social worker has a duty to identify the services that are available in the institution, advise the parents what services they should participate in, and maintain reasonable contact with the parent. Counsel contended that in this case, there was "no evidence that the social worker made any attempt to identify coursework in the prison that was available for [father] at any of the facilities that he was in." Counsel argued that to the extent any attempt was made by the social worker, it was not mentioned in the social worker's reports. Instead, most of father's case plan indicated that he was to be referred upon his release from prison. Counsel also argued that father did attempt to engage in various services that were available.

Counsel for the child agreed with the Department's recommendation to terminate reunification services and to set a section 366.26 hearing.

The juvenile court announced its decision on November 20, 2024. The child was nearly two years old. The court terminated reunification services for both parents and set a section 366.26 hearing. The court made several findings, including that returning the child to his parents would create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being and that by clear and convincing evidence reasonable services were offered or provided to mother and father. Regarding reasonable

15

services to father, the court referred to, among other efforts by the social worker, coordinating phone calls between father and child, providing father with information while in custody regarding intimate partner violence and child development, providing father with coloring pages to color and send to the child, and sending the case plan to father. The court also stated that father had "participated in . . . some programs that were available to him in custody."

## III.    DISCUSSION

Father contends that there is no substantial evidence upon which the juvenile court could have found by clear and convincing evidence that the Department provided or offered reasonable services.

### A.  General Legal Principles

#### 1.  Requirement of Reunification Services

"When a child has been removed from a parent's custody, the court ordinarily must order child welfare services designed to facilitate the reunification of the family. [Citations.]" (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624, fn. omitted (*Michael G.*).) " ' "Reunification services" ' . . . ' "implement 'the law's strong preference for maintaining the family relationships if at all possible.' " ' [Citation.] This is because 'services enable [parents] to demonstrate parental fitness and so regain custody of their dependent children.' [Citation.]" (*Ibid.*)

#### 2.  Reasonable Services

The supervising agency must design the reunification services " 'to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' [Citation.] Accordingly, a reunification plan must be appropriately based on the particular family's 'unique facts.' [Citation.]" (*In re T.G.* (2010) 188 Cal.App.4th 687, 696.) The agency " 'must make a good faith effort to develop and implement a family reunification plan. [Citation.] "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to

remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . ." [Citation.]' [Citation.]" (*Id.* at p. 697.)

"In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) "Such circumstances necessarily include the mental condition of the parent, [the parent's] insight into the family's problems, and [the parent's] willingness to accept and participate in appropriate services." (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.)

### 3. Services for an Incarcerated Parent

As we have set forth above, "[w]hen a child has been removed from a parent's custody, the court ordinarily must order child welfare services designed to facilitate the reunification of the family. [Citations.]" (*Michael G.*, *supra*, 14 Cal.5th at p. 624, fn. omitted.) Under section 361.5, subdivision (e)(1), if a parent "is incarcerated, . . . the court shall order reasonable services unless the court determines, by clear and convincing evidence, those services would be detrimental to the child." (See *In re Christopher L.* (2022) 12 Cal.5th 1063, 1079.) However, a parent "in custody prior to conviction shall not be denied reunification services . . . ." (§ 361.5, subd. (e)(4).) In this case, there was no finding that reunification services would be detrimental to the child. Consequently, "the department was required to offer or provide reasonable reunification services to the incarcerated father [citations], despite difficulties in doing so or the prospects of success. [Citations.]" (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1013 (*Mark N.*).)

"In determining the content of reasonable services, the court shall consider the particular barriers to an incarcerated . . . parent's access to those court-mandated services and ability to maintain contact with the child, and shall document this information in the

child's case plan." (§ 361.5, subd. (e)(1).) The services provided to an incarcerated parent may include, but are not limited to: "[m]aintaining contact between the parent and child through collect telephone calls"; "[t]ransportation services, when appropriate"; and "[v]isitation services, when appropriate." (*Id.*, subd. (e)(1)(A)-(C).) In addition, an incarcerated parent "may be required to attend counseling, parenting classes, or vocational training programs as part of the reunification service plan if actual access to these services is provided. The social worker shall document in the child's case plan the particular barriers to an incarcerated, institutionalized, or detained parent's access to those court-mandated services and ability to maintain contact with the child." (*Id.*, subd. (e)(1)(D)(ii).)

The department "may not simply conclude that reunification efforts are not feasible on the sole ground the parent is incarcerated. [Citations.]" (*Mark N.*, *supra*, 60 Cal.App.4th at p. 1012.) "[T]he department is not excused from offering or providing court-ordered reasonable reunification services because of difficulties in doing so or the prospects of success." (*Id.* at pp. 1014-1015.)

Instead, "[t]he department must preliminarily identify services available to an incarcerated parent. [Citation.]" (*Mark N.*, *supra*, 60 Cal.App.4th at p. 1012.) The "department should, at a minimum, . . . contact[] the relevant institutions to determine whether there [is] any way to make services available to the [incarcerated parent]." (*Id.* at p. 1013.) Although "the department cannot tell prison officials how to run their institutions, it can: notify the prison an incarcerated parent is in need of reunification services; determine whether any appropriate services are available at the particular institution in question; and explore whether changes in the housing of the parent prisoner can be made to facilitate the provision of such services consistent with legitimate prison and public safety concerns." (*Ibid.*) At the same time however, if "no services [are] available to [the parent] in prison (because of the manner in which [the parent] was housed), [the parent's] inability to participate [is] not the department's fault. [Citation.]

The prisons are run by the Department of Corrections, not by the department. [Citation.]" (*Ibid.*)

In *Mark N.*, the appellate court found no substantial evidence that reasonable reunification services were provided where, among other failures, "the department made *no* effort to determine whether any services were available or could be provided to the incarcerated father," and the "department never contacted any institution to determine the availability of services to the father." (*Mark N.*, *supra*, 60 Cal.App.4th at p. 1013.) The appellate court explained, "The department does not meet its obligations when, as here, it simply concludes: The father is in prison; he knows what the requirements of his case plan are; he was imprisoned before any referrals were made; he says no services are available to him; and being unaware of any resources to assist the incarcerated parent with reunification, the department need not take any action to facilitate the reunification process." (*Ibid.*) The appellate court determined that the department "cannot delegate to an incarcerated parent the responsibility for identifying such services." (*Id.* at p. 1012.) Moreover, the incarcerated parent is "not required to complain about the lack of reunification services as a prerequisite to the department fulfilling its statutory obligations" to offer or provide reasonable reunification services. (*Id.* at p. 1014.)

#### 4. Timeframe for Services and Burden of Proof

#### Services Were Reasonable

"To balance the interest in family preservation with the child's interest in the prompt resolution of [the child's] custody status and long-term placement, the dependency law establishes a detailed timeline for reunification. . . . Parents of children under three are presumptively eligible for at least six months of reunification services. (See [§ 361.5], subd. (a)(1)(B).)" (*Michael G.*, *supra*, 14 Cal.5th at p. 625.)

"During the reunification stage, the juvenile court must hold periodic review hearings to evaluate the status of reunification efforts and appropriate next steps. [Citation.] . . . At each review hearing, a court evaluates, among other things, the

19

adequacy of the reunification services offered or provided and the extent of the parent's progress." (*Michael G.*, *supra*, 14 Cal.5th at p. 625.)

At the six-month review hearing, if the child is not returned to the parent, "the court shall determine by clear and convincing evidence whether reasonable services that were designed to aid the parent . . . in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent . . . ." (§ 366.21, subd. (e)(8).) "If, at the six- or 12-month status review hearing, the court finds . . . that reasonable services were not provided to the parent, the court extends reunification services for an additional six months rather than proceed to the final stage of dependency proceedings, permanency planning. [Citations.] . . . In other words, at the six- and 12-month status hearings, the court must find that the parent has been provided or offered reasonable reunification services before the court can proceed to set a hearing to decide whether to terminate parental rights and select a permanent plan for the child." (*Michael G.*, *supra*, 14 Cal.5th at p. 625, fn. omitted; see §§ 361.5, subd. (a)(3)(A), 366.21, subds. (e)(3) & (g)(1).) "[T]he Department . . . ha[s] the obligation to make a record at the six-month and twelve-month review hearings establishing that reasonable services were provided." (*In re Precious J*. (1996) 42 Cal.App.4th 1463, 1478; see also *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345.)

### 5.  Standard of Review

" 'When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence. [Citation.]' " (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 674 (*Serena M.*).)  " 'A finding that reasonable reunification services have been provided must be made upon clear and convincing evidence. [Citation.]' " (*Ibid*.)  " 'Where clear and convincing proof is required, the proponent must convince the jury or judge, as the case may be, that it is highly probable that the facts which [the proponent] asserts are true. [The proponent] must do more than show

20

that the facts are probably true.' [Citation.]" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998–999, italics omitted.) A reviewing court will uphold a finding based upon clear and convincing evidence if "the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true"—in this instance, that reasonable services were provided or offered to father. (*Id.* at p. 1011; see *id.* at pp. 995–996; *In re V.L.* (2020) 54 Cal.App.5th 147, 155 [*Conservatorship of O.B.* standard applies to findings by clear and convincing evidence in dependency proceedings].) In making this determination, the appellate court "must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.*, *supra*, at p. 996; see *id.* at pp. 1011–1012.)

### B. *Analysis*

Father contends that there is not substantial evidence that he was offered or provided reasonable services. He argues that the Department failed to facilitate his access to services while in custody or assess his progress, failed to arrange in-person visitation with the child, and failed to maintain reasonable contact with father.

The juvenile court concluded, based upon clear and convincing evidence, that the Department had provided or offered reasonable services to father. The case plan for father included: (1) a parenting class, (2) a program of counseling or psychotherapy addressing domestic violence and substance abuse and the effect on the child, (3) random alcohol and/or drug testing at least once a week, (4) a 12-step program or other substance abuse self-help program, (5) a substance abuse assessment and treatment programs as recommended in the assessment, (6) an aftercare drug treatment program, (7) a certified 52-week batterer's intervention program, and (8) after father is released from custody, supervised visitation. The record reflects that the social worker's efforts primarily consisted of (a) providing father with "workbook/pamphlets" regarding intimate partner

21

violence and child development, (b) providing father with coloring pages to color and send to the child, and (c) coordinating phone calls between father and child.

We determine that the record does not contain substantial evidence from which the juvenile court could have found it highly probable that reasonable services were provided or offered to father. (See *Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012.) The Department's ability to offer or provide services to father was affected by his incarceration. The record reflects that although the Department made some efforts regarding services for father while he was at Elmwood, no services were offered or provided, aside from phone visitation, while father was in state prison from May 2024 to November 2024, when the juvenile court terminated services. The Department "should, at a minimum, have contacted the relevant institutions to determine whether there was any way to make services available to . . . father. [Citations.]" (*Mark N.*, *supra*, 60 Cal.App.4th at p. 1013.) In this case, there is no evidence that the Department contacted any facility where father was in custody to "notify the [facility that he was] . . . in need of reunification services; determine whether any appropriate services [were] available at the particular institution in question; and explore whether changes in the housing of the parent prisoner [could] be made to facilitate the provision of such services consistent with legitimate prison and public safety concerns." (*Ibid*.) Although the social worker encouraged father to take advantage of any services offered to him while he was incarcerated, the Department "cannot delegate to an incarcerated parent the responsibility for identifying such services." (*Id.* at p. 1012; accord *In re Monica C.* (1995) 31 Cal.App.4th 296, 307–308.)

The Department "acknowledges that it could have contacted the various" state prisons where father was incarcerated "to determine what services might have been available to him there." The Department contends, however, that "given . . . father was at the first institution only temporarily, was apparently in solitary confinement for his entire time at the second, and chose to work full-time at the third, it is not at all clear

what impact the social worker's contact with each of the facilities would have done to move the needle on . . . father's engagement in services while in state prison."

We are not persuaded by the Department's argument. First, while father was at Elmwood, there was regular communication between father and the social worker, and father participated in various programs and classes offered at Elmwood. While the Department acknowledges that it did not contact any of the three state prisons, it is not clear from the record whether the Department contacted the local facility, Elmwood, to determine whether relevant services might have been available to father at that location.

Second, father was incarcerated at the first state prison for approximately two months. In a statutory scheme where children under three are eligible for six months of reunification services (see *Michael G.*, *supra*, 14 Cal.5th at p. 625), the Department fails to provide legal authority suggesting that it is relieved from the duty to provide services if a parent remains at a location for only two months.

Third, regarding the Department's apparent suggestion that contacting the prisons might not have "move[d] the needle on . . . father's engagement in services while in state prison," the record reflects that father expressed a willingness to engage in, and did engage in, services while he was in local custody in Elmwood, including attending substance abuse treatment classes and apparently reviewing a workbook and pamphlets provided by the social worker. He also participated in other courses, including college level classes and rehabilitation courses, even though they were not part of his case plan. Moreover, father testified at the contested six-month review hearing that he was willing to engage in appropriate case plan services if offered at the prison where he was located. The Department acknowledges that father remained at that third prison from the summer of 2024 (around July or August) through at least late November 2024, when the juvenile court issued its order terminating services. Although the Department characterizes father as having "chose[n] to work full-time" at that prison – with the implication by the Department that father would not or could not also participate in services – there is no

23

evidence in the record to suggest that, to the extent any services were available at that prison, father would not have been able to participate due to his work or that he would have chosen to work instead of participating in services. In sum, it appears from the record that, to the extent appropriate case plan services may have been available in prison, if the Department had contacted the prison and identified them to father, he indicated that he would have been willing to participate in them.

The Department also contends that there is no evidence that father told the social worker that he needed assistance in accessing services while in custody, and "a parent has some responsibility to notify the agency of perceived inadequacy of services." In support of this argument, the Department cites *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490 (*Earl L.*).

We find *Earl L.* distinguishable. In that case, the father "stipulated he had been provided with reasonable services at the six- and 12-month reviews." (*Earl L.*, *supra*, 199 Cal.App.4th at p. 1507.) Although the juvenile court found at the 18-month hearing that reasonable reunification services had not been provided "during the current reporting period," the juvenile court nevertheless found that "services 'overall' were reasonable." (*Id.* at pp. 1500, 1502.) The appellate court denied the father's subsequent writ petition regarding the setting of the section 366.26 hearing. (*Earl L.*, *supra*, at p. 1508.) The appellate court observed that the "father did not sign the case plan, declined to attend review hearings, and made no effort to alert his appointed counsel to any issues concerning reunification services." (*Id.* at p. 1505.) The appellate court explained, " 'A noncustodial parent may not refuse to participate in reunification treatment programs until the final reunification review hearing has been set and then demand an extension of the reunification period to complete the required programs. [Citations.] Neither may a parent wait silently by until the final reunification review hearing to seek an extended reunification period based on a perceived inadequacy in the reunification services occurring long before that hearing.' [Citation.]" (*Ibid.*) The appellate court concluded,

24

"It defies common sense to continue reunification efforts for a parent who has made minimal efforts throughout a case. There is no probability the court would return the child to the physical custody of this parent within the extended period of time (24 months). As the juvenile court found here, there was not the 'smallest chance' father would benefit from additional reunification services." (*Ibid.*) In contrast to the father in *Earl L.*, in the instant case father demonstrated a willingness to participate in services since the time he was in local custody at Elmwood.

Father also contends that he was not provided reasonable services because his case plan was inadequate and did not provide for in-person visitation. (See *In re Dylan T.* (1998) 65 Cal.App.4th 765, 770 ["absent certain circumstances, visitation must be provided to the incarcerated parent"].) The Department contends that father has forfeited this contention by failing to raise it below. In this regard, father's case plan provides for supervised visitation "when he is released from custody." The Department observes that father did not object to this provision when the Department first proposed it, nor did he object to the case plan when the juvenile court adopted it at the jurisdictional/dispositional hearing. Instead, at that hearing, father's counsel only requested phone calls between father and child. The social worker accommodated this request by scheduling telephone contact between father and child for two hours, twice a week. Although father raised no objection to the visitation provision in particular, or the case plan in general, we need not decide whether father has forfeited his contention. As we have already concluded that substantial evidence does not support a finding that father was provided reasonable services, father may raise the issue of future visitation in the juvenile court in the first instance.

Regarding father's contentions that the Department failed to maintain reasonable contact with him[3] and that the Department failed to adequately assess his progress after

---

[3] Regarding the Department's efforts to maintain contact with father, we note that (continued)

25

he completed certain programs in custody, we similarly need not resolve these issues as we have already determined that substantial evidence does not support a finding that father was provided reasonable services.

Lastly, father requests that this court take judicial notice of 15 documents to establish certain facts, such as the date that father was transferred to prison, or to "assess[] the credibility of [father's] testimony" at the contested six-month review hearing. " 'Reviewing courts generally do not take judicial notice of evidence not presented to the trial court' absent exceptional circumstances. [Citation.]" (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2.) Here, no exceptional circumstances appear for father's failure to provide the documents to the trial court in connection with the contested hearing. Moreover, under the substantial evidence standard of review, we do not reweigh credibility. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 996; see *id.* at pp. 1011–1012.) Therefore, we deny father's request for judicial notice in its entirety.

In sum, we conclude that there is not substantial evidence to support a finding that reasonable reunification services were provided to father. "The juvenile court cannot terminate parental rights if a parent never receives reasonable services. [Citations.]" (*Michael G.*, *supra*, 14 Cal.5th at p. 637, italics omitted.) Therefore, the order terminating reunification services and setting a section 366.26 hearing must be vacated. Father is entitled to an additional period of reunification services. (See, e.g., *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1256 ["where . . . a timely challenge to the adequacy of services for the statutorily required minimum period . . . is sustained, that failure to provide services will justify the extension of services"], disapproved on another ground in *Michael G.*, *supra*, at p. 631, fn. 8; accord, *Serena M.*, *supra*, 52 Cal.App.5th at p. 678.)

---

even father's counsel reported "difficulty" in reaching father while he was "transported around" and that on one occasion, the Department contacted father's counsel on behalf of father.

## IV.    DISPOSITION

The petition for an extraordinary writ is granted.  Let a peremptory writ of mandate issue directing respondent superior court to (1) vacate its finding that reasonable reunification services were provided or offered to father, R.R.; (2) vacate its November 20, 2024 order terminating reunification services and setting a permanency and planning hearing under Welfare and Institutions Code section 366.26; and (3) enter a new and different order finding that reasonable reunification services were not provided or offered to father and ordering the Department to provide father with an additional period of reunification services.  Father's request for a temporary stay is denied as moot.  This opinion is final as to this court immediately on filing.  (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

_____
BAMATTRE-MANOUKIAN, ACTING P. J.

WE CONCUR:

_____
DANNER, J.

_____
WILSON, J.

***R.R. v. Superior Court***
**H052729**